UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

IN RE:

**TOMMY JOE GIOELE**                          CASE NO. 09-11448

    DEBTOR                                         CHAPTER 7


**MANUEL PERSICA, III**

    PLANTIFF

V.                                            ADV. NO. 09-1137

**TOMMY JOE GIOELE**

    DEFENDANT


**MEMORANDUM OPINION**

Plaintiff Manuel Persica, III contends that debtor Tommy Joe Gioele should lose his discharge because he transferred property before filing chapter 7, lied on his schedules of assets and debts and statement of financial affairs and sought to persuade a third party to take measures to discourage Persica from prosecuting his claim in Gioele's bankruptcy and this adversary proceeding.  11 U.S.C. §§727(a)(2) and (4).[1]  Although the debtor denied Persica's allegations, the evidence supports a finding and conclusion that Gioele's actions justify denying him a discharge.

---

[1] Persica's original complaint [P-1] alleged only a violation of 11 U.S.C. §727(a)(2)(A).  He amended the complaint [P-44] ten months later with leave of court adding claims under 11 U.S.C. §727(a)(4) (A) and (C) and (a)(6). Persica waived the section 727(a)(6) claim in his pretrial memorandum.  Plaintiff's Pretrial Memorandum, p. 2 [P-69].

FACTS

Gioele agreed to pay Manuel A. Persica, III $257,000[2] for a restaurant. According to the debtor's trial testimony, after he purchased the business he learned that it was subject to tax liens for obligations Persica had failed to pay. The unpaid tax liabilities caused the business to lose its liquor and video gaming licenses and the related revenues. Eventually the restaurant failed[3] and American Gateway bank seized the restaurant's equipment to satisfy its debt. Gioele filed chapter 7 on September 16, 2009, in part as a result of debts related to the business, and after suing Persica, who brought their dispute into the bankruptcy court by objecting to Gioele's discharge.

*1. Debtor's statements at creditors' meetings*

Gioele's testimony at his first meeting of creditors[4] began with his unqualified statement that he had read, reviewed and signed his schedules and statements.[5] Despite vouching for the accuracy of those filings, Gioele hedged his answers to the trustee's questions, insisting repeatedly that he could not read, was dyslexic and had very poor short-term memory. The debtor also sought to avoid answering some questions by claiming that his ex-wife, Heidi, previously had handled all their financial matters, including those related to the failed restaurant, and that his current wife, Lana, later took over those duties.

At the meeting the debtor also testified that he had not transferred any property during the three years before chapter 7 except the transfers disclosed on the statement of financial affairs, which was consistent with his response to question 10 on the statement. However, Gioele

---

[2] Exhibit 2, Proof of Claim of Manuel Persica, III, claim 6 on the register in case number 09-11448.

[3] The debtor testified that the business closed in August 2009.

[4] Persica introduced a compact disc recording of the debtor's two creditors' meetings at trial as Exhibit P-3.

[5] Exhibit P-1, original schedules and statement of financial affairs. The debtor's initial meeting of creditors was on October 29, 2009.

admitted to Persica's lawyer on cross-examination that he had sold a coin collection and generator prepetition before bankruptcy, later telling the trustee that he'd "probably" used the sales proceeds to pay bills.

In response to the debtor's revelations, the trustee told Gioele to amend his schedules and statement of financial affairs[6] and continued the meeting to question the debtor further. At the continued meeting of creditors, Gioele again testified under oath that he had reviewed his amended schedules and statements with his attorney and they were accurate,[7] though he reiterated that he could not read and had terrible short-term memory. Examination soon established that the amendments still did not accurately portray the debtor's finances. Among other things, Gioele admitted to Persica's attorney that the amended schedules omitted his debt to Brian Kimble for $5,000 he'd borrowed before filing bankruptcy.

### 2. *Debtor's schedules and statements of financial affairs*

In summary, the debtor's original and amended schedules and statements of financial affairs differ in at least five material ways:[8]

---

[6] Trustee Samera Abide's proceeding memorandum for the first meeting of creditors [P-24] reflected her request that the debtor amend his schedules to list the litigation with Persica. The debtor's omission of his litigation with Persica was especially material because the debtor initiated that lawsuit, making the claim property of the estate. 11 U.S.C. §541(a).

[7] Exhibit P-2 (amended schedules and statement of financial affairs). Gioele filed amended schedules and statements the day of the continued meeting, November 3, 2009.

[8] The defendant's post-trial memorandum argues that the plaintiff's amended complaint pled that Gioele violated 727(a)(4)(A) *only* by misstating his income and income sources, and that as a result the court cannot consider any other allegedly false oaths. However, at trial plaintiff introduced evidence that the debtor made other false statements in his schedules and statements and at the meetings of creditors. Also, the plaintiff's pretrial exhibit list [P-67] includes all the debtor's schedules and statements as well as the audio recordings of the creditor meetings. Debtor's counsel did not object to introduction of any of this evidence. Federal Rules of Civil Procedure Rule 15(b) (adopted as Fed. R. Bankr. P. 7015(b)) states "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." A sign of implied consent is that "issues not raised by the pleadings are presented and argued without proper objection by opposing counsel." *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 389 (5th Cir. 1984). Thus, evidence of the other false oaths is considered as though the plaintiff had included them in the amended complaint.

(1) Both the original and amended schedules identified Persica as a creditor but only the amended statement of financial affairs revealed Gioele's pre-bankruptcy lawsuit against Persica.

(2) Gioele's original schedule I identified his sole source of income as Halgo PEC, Inc. ("Halgo"), where he had worked as a rig welder for about four months before bankruptcy. Gioele listed his monthly income from Halgo as $3,812.25.  However, the amended schedule I showed that he also received $2,425 a month for "use of truck/equipment."[9]

(3) The debtor's amended schedule B disclosed for the first time that the debtor owned personal property including a 42" television, four shotguns, a 1970 Kubota tractor, a welding machine and tools, and three deer.

(4) A 2006 Nissan Frontier listed as Gioele's property on the original schedule B does not appear among the debtor's assets on amended schedule B; instead, the amended statement of financial affairs describes it as property the debtor holds for his former wife, Heidi Gioele.[10]

(5) Gioele's original statement of financial affairs discloses only three property transfers in the two years before bankruptcy: sales of a backhoe and a gooseneck trailer, and the debtor's community property settlement with Heidi Gioele.[11]  The response to question 10 on the amended statement added sales of a coin collection for $14,800 and a generator for $1,000.

### 3.  Trial testimony

Gioele first insisted at trial that his schedules and statements disclosed all his assets even though his attorney prepared them: "If it's on there, I'm pretty sure it's right."  However, in a scene reminiscent of his testimony at the creditors' meetings, Gioele was forced to admit on

---

[9]  The debtor admitted at trial that he had been receiving the per diem since he began working at Halgo.

[10]  Exhibit P-2, Amended Statement of Financial Affairs, question 14.

[11]  The debtor testified that his former wife received nothing in the June 2009 settlement, since all the assets were encumbered.

4

cross-examination that the schedules even as amended remained inaccurate.[12] Gioele sought to distance himself from the inaccuracies by explaining that his former wife Heidi helped his bankruptcy lawyer amend the schedules, and that Heidi and his current wife knew his personal finances better than he did. He also acknowledged omitting his state court lawsuit from the original schedules, testifying that he knew nothing about his lawsuit against Persica because his former wife was handling it. In fact, at trial Gioele claimed not to know exactly what he owned. Gioele again asserted his functional illiteracy, dyslexia and poor memory[13] for his inability to give definite answers to specific questions concerning his finances and errors in his schedules.

      One of Gioele's information lacunae is especially troubling. The debtor could not explain why his Dow Louisiana Federal Credit Union account reflected deposits exceeding $50,000 in 2009, even though both his original and amended statements of financial affairs indicated that his year-to-date income through September 2009 was only $18,455.[14] The debtor's testimony on the topic was evasive: eventually he speculated that the money represented savings from an earlier job, even though he'd testified at the first meeting of creditors that he had no cash or accounts other than the Dow Louisiana Federal Credit Union account when he filed chapter 7. In any case, at trial he could not identify the source of large deposits into his credit union account in June and July 2009.

---

[12] After listening to the audio recordings of his two creditors' meetings, Gioele confirmed his verification of the accuracy of his bankruptcy schedules and statements at those meetings.

[13] The defendant offered absolutely no evidence to corroborate his claim of dyslexia or substantiate that he suffers from any condition leading to unusual memory loss.

[14] Dow Federal Credit Union account history (Exhibit P-4). The $50,000 includes $16,200 total in June and July 2009 but does not include the $14,800 sale proceeds from Gioele's coin collection.

5

The errors in and omissions from papers Gioele filed in his bankruptcy are serious matters. The most troubling aspect of the plaintiff's claims, however, relates to steps Gioele allegedly took to influence the outcome of his bankruptcy case and this adversary proceeding.

Specifically, James H. Roth, III testified pursuant to plaintiff's subpoena about his contact with Gioele on August 22, 2010, the day before the scheduled pretrial conference in this proceeding. Roth testified that an angry Gioele – whom Roth had not met before – came onto Roth's property that day and said that he (the debtor) was going to kill horses that belonged to the plaintiff's father, Manuel Persica Jr. Roth stated that Gioele displayed a sum of cash while asking Roth "how many of these bills would it take" for Roth to kill the horses for him.[15] Roth said that Gioele also offered to buy Roth a rifle to shoot the horses but cautioned that Roth would have to destroy the rifle afterward. Roth testified that Gioele also mentioned that he had a court date with the plaintiff the next day. Roth eventually told Gioele to leave his property and reported the incident to the West Baton Rouge Sheriff, who later arrested Gioele.[16]

Gioele denied contacting Roth to try to affect the bankruptcy case. The debtor insisted that he went on Roth's property that day to look for his deer because he heard "on the street" that Persica Jr. had them. He admitted talking with Roth about Persica Jr. that day, and claimed Roth said he held a grudge against Persica Jr. and that he might shoot Persica, Jr. or his horses if he had the chance. Gioele testified that he had told Roth he'd "pay" (for the shooting), but insisted that his comment was meant as a joke, "two people blowing off steam over some man that really

---

[15] Roth's report to the sheriff of Gioele's statements led to the debtor's arrest.

[16] Gioele was charged with inciting a felony, a violation of La. R.S. 14:28. Affidavit of Probable Cause, "State of Louisiana v. Tommy Gioele," No. 10-80291. P.8 of Exhibit A to Plaintiff's Objection to Motion for Partial Judgment on Pleadings [P-61]. Roth explained that he reported the incident to the sheriff to avoid having "problems" with the plaintiff's father, with whom he'd had a prior dispute of some sort. Roth did not want to be blamed for anything that might befall Persica, Jr. The charges later were dismissed and expunged, according to the debtor. No party offered other evidence of the disposition of the criminal matter.

6

destroyed both of us." However, he conceded on cross-examination that he "might have" offered to pay Roth to kill Persica Jr.'s horses and to buy Roth a new rifle for that purpose.

The debtor also acknowledged talking to Roth about the incident before the trial but denied that he told Roth how to testify or suggested that Roth characterize the incident as a joke.

ANALYSIS

The plaintiff sued to deny the debtor's discharge under 11 U.S.C. §§727(a)(2)(A) and (a)(4)(A) and (C). Although the plaintiff did not prove his claim under section 727(a)(2), the evidence established that Gioele is not entitled to a discharge under section 727(a)(4).

1. *Persica did not Prove that Gioele Made Intentionally Fraudulent Transfers that Would Bar his Discharge under 11 U.S.C. §727(a)(2)(A)*

Persica identifies two reasons for denying Gioele's discharge under §727(a)(2)(A): (1) shortly before filing chapter 7 the debtor sold a generator for $1,000 that he'd bought for $8,000 a year earlier; and (2) the debtor was unable to explain substantial cash withdrawals from his checking account in the months before bankruptcy, including specifically $5,000 withdrawn in August 2009. However, Persica did not prove Gioele made the transfers with the intent to deceive or defraud creditors essential under §727(a)(2)(A).[17]

Gioele testified that the generator was inoperable when he sold it and doubted he could have sold it for more than $1,000. The plaintiff did not prove that the generator was worth significantly more than $1,000 so the evidence does not support an inference that Gioele intended to defraud his creditors through the generator sale. Moreover, although Gioele's explanation of his use of cash withdrawn from his Dow Louisiana Federal Credit Union account lacked detail, he did explain that he used the money to pay his divorce attorney and for ordinary

---

[17] Section 727(a)(2)(A) requires proof that the debtor actually intended to defraud, which may be inferred from the debtor's actions. *In re Chastant*, 873 F.2d 89, 91 (5th Cir. 1989).

living expenses and other obligations. On balance, the evidence regarding the cash withdrawals is insufficient to prove Gioele's actual intent to deceive.

    2. *Gioele's False Oaths Require Denial of his Discharge under 11 U.S.C. §727(a)(4)(A)*

Bankruptcy Code section 727(a)(4)(A) commands the court to grant the debtor a discharge unless "the debtor knowingly and fraudulently, in or in connection with the case … made a false oath or account…." To prevail Persica must prove that:

> (1) the debtor made a statement under oath;
>
> (2) the statement was false;
>
> (3) the debtor knew the statement was false;
>
> (4) the debtor made the statement with fraudulent intent; and
>
> (5) the statement related materially to the bankruptcy case.

*In re Pratt*, 411 F.3d 561, 566 (5th Cir. 2005), citing *Matter of Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992).

The evidence established that the debtor falsely verified the accuracy of his original and amended schedules and statements first when he signed them under penalty of perjury, and a second and third time at the creditor meetings. Moreover, at trial as well as at his creditor meetings Gioele admitted on cross-examination that he knew about several errors in his schedules and statements of financial affairs, despite steadfast insistence that he knew – and could recall – very little about his finances. His denials are not credible. Moreover, the false statements were material.[18] Accordingly, the only remaining issue is whether the debtor made the false statements with fraudulent intent.

---

[18] False oaths leading to loss of discharge include "(1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings." *Beaubouef*, 966 F.2d at 178. A debtor's statement or omission materially relates to a case if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and

Section 727(a)(4)(A) exacts the severe penalty of loss of the discharge only for intentionally false statements and not for those that are honest mistakes. *Beaubouef*, 966 F.2d at 178. However, numerous false statements, combined with failure to resolve the inconsistencies and omissions in amended schedules, weigh against a conclusion that the misstatements were honest. Instead, they betray a "reckless indifference to the truth and, therefore, the requisite intent to deceive." *Id.*[19] So it is with Gioele's filings.

Gioele's original schedules and statements did not disclose all his monthly income, omitted personal property, failed to disclose pre-bankruptcy asset transfers and his state court litigation against Persica and left out at least one creditor, Kimble, who still is not listed in the schedules despite the debtor's amendment. The schedules and statements also inaccurately described ownership of former marital property and failed to specify that Gioele was the plaintiff in the pre-bankruptcy litigation with Persica.

Instead of attempting to correct these omissions and misstatements at his creditors' meetings, Gioele's responses to questions about his finances became more confusing and evasive as the trustee and Persica's counsel probed the details of his financial condition. His answers at trial were similarly equivocal. For example, although Gioele stated to the trustee at the creditors' meeting that he had only one bank account before bankruptcy and no cash, his only explanation for the large deposits into his Dow Louisiana Federal Credit Union account in the nine months

---

disposition of his property." *Id*. Gioele's contention that some of the omitted assets were worthless or inoperable is irrelevant. " 'In determining whether or not an omission is material, the issue is not merely the value of the omitted assets ....' " *Id*. (citation omitted). A debtor must fully disclose his assets and financial affairs so that the trustee and creditors may determine the value of the debtor's assets and his financial condition.

[19] Amendment of schedules will not protect an otherwise culpable debtor. An amendment that reveals previously concealed information does not necessarily negate a finding that the debtor had fraudulent intent. This is especially true when a debtor amends the filings only after discovery of the false statements, as Gioele did. *See In re Sholdra*, 249 F.3d 380, 382-83 (5th Cir. 2001) (finding fraudulent intent when debtor amended original schedules and statements only after a deposition revealed the falsehoods); *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir. 1991) (debtor's filing amended schedules only after his former wife revealed omitted assets to a judgment creditor supported finding of fraudulent intent).

prepetition was that the money represented either his pay or else savings from his earnings at a previous job. This supports an inference that Gioele owned cash or another bank account that he did not disclose to the trustee.

Gioele's attempts to deflect responsibility by blaming his false statements on dyslexia, inability to read, poor memory or memory loss and reliance upon his current or former wives to manage his financial affairs undermine the debtor's credibility. The debtor offered absolutely no corroborating evidence of his dyslexia or abnormal memory problems, nor did he offer corroborating testimony from his current or former wives about financial matters they allegedly had handled for him.

In summary, no credible evidence established that Gioele's errors and omissions resulted from honest mistakes. The cumulative effect of the debtor's false statements and his failure to correct the omissions and misstatements promptly evidences a pattern of reckless and cavalier disregard for the truth that is sufficient to prove his fraudulent intent under section 727(a)(4)(A).

2. *Gioele's Fraudulent Attempts to Influence the Bankruptcy Merit Discharge Denial under 11 U.S.C. §727(a)(4)(C)*

Bankruptcy Code section 727(a)(4)(C) deprives a debtor of a discharge if the debtor "knowingly and fraudulently, in or in connection …with the case—

> (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act."

Few reported opinions discuss the application of section 727(a)(4)(C), which according to the leading treatise penalizes a debtor who commits or attempts extortion or who accepts or offers a bribe. 6 COLLIER ON BANKRUPTCY ¶727.06, p. 727-42 (16th ed. rev. 2010). The legislative history indicates that the provision was intended to deny a discharge to a debtor who commits a

10

bankruptcy crime,[20] although the standard of proof is preponderance of the evidence rather than proof beyond a reasonable doubt. S. Rep. No. 989, P.L. 95-598, Bankruptcy Reform Act of 1978, 1978 U.S.C.C.A.N. 5787, 5884-5.

> To prevail under this section a plaintiff must prove:
>
> > (a) knowledge and a fraudulent intent on the part of the debtor, and
> >
> > (b) receipt of or an attempt to obtain, or the giving and offering of, money, property, or advantage, or a promise of these, for a purpose, namely, action or forbearance in the case in which the offender is a debtor.

6 COLLIER ON BANKRUPTCY ¶727.06, p. 727-42 (16th ed. rev. 2010).

The debtor admitted that he went onto Roth's property uninvited on August 22, 2010. He claimed he was searching for his missing deer, which he believed were on property that adjoined Roth's land and belonged to the plaintiff's father, who pastured horses there. Gioele said he spoke with Roth, whom the debtor claimed had a grudge against Persica, Jr. (the plaintiff's father). He testified that Roth told him that he (Roth) might shoot Persica, Jr. or the horses if given the opportunity. Gioele conceded on cross-examination that he "might have" offered to pay Roth to kill Persica Jr.'s horses and to buy Roth a new rifle to do so but insisted that he meant the offer as a joke.

Roth's testimony concerning his talk with Gioele that day differed starkly from Gioele's version of the events. Roth did not treat the debtor's statements as a joke.[21] In fact, Roth had an earlier dispute with Persica Jr. and Gioele's remarks led Roth to fear that he would be blamed if

---

[20] 18 U.S.C. §152 punishes as a felony knowing and fraudulent conduct in connection with bankruptcy cases including, in section 152(6), giving, offering, receiving or attempting to obtain money or property, remuneration, compensation, reward advantage, or promising to do the aforementioned, for acting or forbearing to act in a bankruptcy case.

[21] Although Roth seemed to agree with Gioele's counsel on cross-examination that the debtor may only have been "blowing off steam," his reporting the incident to the sheriff out of concern that he may have been blamed for anything that befell Persica Jr. indicates that he considered the debtor's statements serious.

anything happened on Persica Jr.'s property. Unlike the debtor's vague description of their meeting, Roth testified to specific facts and statements that left him apprehensive about Gioele's intentions: Gioele was angry when he came onto Roth's property, said he was going to kill Persica Jr.'s horses, and displayed a sum of cash while asking Roth "how many of these bills would it take" for Roth to do the shooting. Roth also said that Gioele offered to buy Roth the rifle to shoot the horses but said Roth would have to destroy it afterward. Finally, Roth testified that Gioele never asked him about the missing deer, which undermined Gioele's explanation for even being on Roth's property.[22]

The debtor's testimony that his statements to James Roth were in jest is implausible and not credible. Considering Gioele's and Roth's testimony, their responses to the questions and their bearing and demeanor on the stand, Roth's testimony is the only credible version of the events of August 22, 2010.

Bankruptcy Code section §727(a)(4)(C) penalizes debtors who try to undermine the bankruptcy process. It appropriately applies to this debtor's August 22, 2010 monetary offer to induce Roth to harm the plaintiff's father's horses the day before the preliminary pretrial conference in this adversary proceeding. The evidence supports an inference that the debtor intended to adversely affect this proceeding and Persica's claim against Gioele in the bankruptcy case. Gioele's actions are not those of an honest debtor and he should not receive a discharge for knowingly and fraudulently taking actions within the scope of section 727(a)(4)(C).

---

[22] Gioele also admitted at trial telephoning Roth the week before trial to discuss "what had happened" on Roth's property in August 2010, a contact Roth confirmed. On cross examination the debtor was evasive about the telephone conversation, stating that he really didn't remember what he'd discussed with Roth but reiterated that the incident was a "joke."

12

CONCLUSION

Manuel Persica, III has met his burden of proof under 11 U.S.C. §§727(a)(4)(A) and (C) and so the court will deny debtor Tommy Joe Gioele's chapter 7 discharge.

Baton Rouge, Louisiana, May 17, 2011.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE